UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**AMANDA ISABEL FANEGO CARDOSO,**

**Petitioner,**

**v.**

**KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security, PAMELA BONDI, in her official capacity as Attorney General of the United States; TODD LYONS, in his official capacity as Acting Director and Senior Official Performing the Duties of the Director of U.S. Immigration and Customs Enforcement; MARY DE ANDA-YBARRA, in her official capacity as Field Office Director of the El Paso Field Office of U.S. Immigration and Customs Enforcement, Enforcement and Removal Operations; DORA CASTRO, in her official capacity as Warden of the Otero County Processing Center,**

**Respondents.**

Case No.

**VERIFIED PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241**

## INTRODUCTION

1.  Petitioner Amanda Isabel Fanego Cardoso, 21 years old, 4 months pregnant female from Cuba, who came to the United States on December 23, 2023, and was granted parole under Section 212(d)(5) of the Immigration and Nationality Act (INA), which grants the Secretary of Homeland Security the discretionary authority to temporarily parole individuals into the United States for urgent humanitarian reasons or significant public benefit, on a case-by-case basis. Petitioner filed for adjustment of status with USCIS under the Cuban Adjustment Act (CAA), Pub. L. No. 89-732, 80 Stat. 1161 (1966), as amended.

2.  By operation of law, the filing of a CAA adjustment application establishes that Petitioner is lawfully present in the United States pending adjudication. See 8 C.F.R. § 245.2(a)(4)(ii)(A) ("An applicant whose properly filed application for adjustment of status … has not been adjudicated is authorized to remain in the United States while the application is pending.").

3.  Because Petitioner has a bona fide application for adjustment of status under the Cuban Adjustment Act currently pending with USCIS, her continued detention as an "arriving alien" is contrary to law. Courts have consistently recognized that the pendency of an adjustment application creates a lawful presence that precludes removal or prolonged detention absent individualized findings. See, *Fernandez v. Mukasey*, 520 F.3d 965, 967 (9th Cir. 2008) (acknowledging lawful presence during pendency of adjustment application).

4. Petitioner has been a resident of Tampa, Florida, since her entry in December 2023, and had been lawfully living with her extended family, working and receiving her prenatal care in the United States.

5. Then, in September of 2025, Petitioner was erroneously arrested and charged with grand theft at a shopping mall in Orange County, Florida. Local police then unlawfully transferred her to federal immigration custody.  Charges are currently pending where Petitioner needs to have her day in Court to defend her charges.

6. Petitioner has been denied bond under Matter of Yajure Hurtado, 29 I. & N. Dec. 216, 220 (Sept. 5, 2025), notwithstanding her statutory eligibility for adjustment, her lack of danger to the community, and compelling humanitarian circumstances.

7. Petitioner remains detained at the Otero County Processing Center in Chaparral, New Mexico, while her adjustment of status application remains pending with USCIS.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction under Art. I, § 9, cl. 2 of the U.S. Constitution (Suspension Clause), 28 U.S.C. § 2241 (habeas corpus), 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1651 (All Writs Act), and 28 U.S.C. § 2201 (Declaratory Judgment Act).

9. Federal district courts have jurisdiction to hear habeas claims brought by noncitizens challenging the lawfulness of their detention. *See Demore v. Kim*, 538 U.S. 510, 516–17 (2003) (recognizing habeas jurisdiction over immigration detention challenges); *Zadvydas v. Davis*, 533 U.S. 678, 687 (2001) (same); *Soberanes v. Comfort*, 388 F.3d 1305, 1310 (10th Cir. 2004) ("Challenges to immigration detention are properly brought directly through habeas.").

10. Immigration detention should not be used as a punishment and should only be used when, under an individualized determination, a noncitizen is a flight risk because they are unlikely to appear for immigration court or a danger to the community. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).

11. Venue is proper in this District under 28 U.S.C. §§ 1391(b) and (e)(1) because Petitioner is detained within the District of New Mexico and her immediate physical custodian is located within this District. *Rumsfeld v. Padilla*, 542 U.S. 426, 443 (2004); *see also United States v. Scott*, 803 F.2d 1095, 1096 (10th Cir. 1986) ("A § 2241 petition for a writ of habeas corpus must be addressed to the federal district court in the district where the prisoner is confined.").

12. No petition for a writ of habeas corpus has previously been filed in any court regarding Petitioner.

**PARTIES**

13. **Amanda Isabel Fanego Cardoso**, named Petitioner, is a 21-year-old citizen of Cuba, an Arriving Alien, 4 months pregnant, who has lived continuously in the United States since December 2023. She has had an adjustment of status application pending under the Cuban Adjustment Act. Since her arrest in August 2025, Petitioner was moved from Florida to New Mexico and has been detained in ICE custody at the Otero County Processing Center in Chaparral, New Mexico.

14. Respondent **Kristi Noem** is named in her official capacity as the Secretary of the U.S. Department of Homeland Security ("DHS"). In this capacity, she is responsible for overseeing ICE's day-to-day operations, leading approximately 20,000 ICE employees,

including Respondents Lyons and De Anda-Ybarra. Secretary Noem is the ultimate legal custodian of Ms. Fanego Cardoso.

15. Respondent **Pamela Bondi** is named in her official capacity as the Attorney General of the United States. As Attorney General, Respondent Bondi oversees the immigration court system, including the immigration judges who conduct removal proceedings and bond hearings as her designees, and is responsible for the administration of immigration laws pursuant to 8 U.S.C. § 1103(g). She is legally responsible for administering Mr. Gamez Lira's removal proceedings, and as such, she is a legal custodian of Ms. Fanego Cardoso.

16. Respondent **Todd Lyons** is named in his official capacity as Acting Director and Senior Official Performing the Duties of the Director of U.S. Immigration and Customs Enforcement and as such is a legal custodian of Ms. Fanego Cardoso.

17. Respondent **Mary De Anda-Ybarra** is named in her official capacity as the Field Office Director for the ICE El Paso Field Office. As Field Office Director, Respondent De Anda-Ybarra oversees ICE's enforcement and removal operations in West Texas and New Mexico. As such, she is a legal custodian of Ms. Fanego Cardoso.

18. Respondent **Dora Castro** is the Warden of the Otero County Processing Center, where Ms. Fanego Cardoso is currently detained. She is a legal custodian of Ms. Fanego Cardoso and is named in her official capacity.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

19. Petitioner has no administrative remedies to exhaust.

20. The charging document for Ms. Fanego Cardoso's removal proceedings—known as a Notice to Appear—names Ms. Fanego Cardoso an "arriving alien." By regulation,

immigration judges lack jurisdiction to redetermine the custody of "arriving aliens" via a bond hearing. 8 C.F.R. § 1003.19(h)(2)(i)(B). As such, Ms. Fanego Cardoso's continued detention in ICE custody cannot be challenged by way of bond proceedings before the Immigration Judge, See Exhibit A.

21. Therefore, a writ of habeas corpus is the sole avenue to vindicate her constitutional, statutory, and regulatory rights and restore her liberty.

## LEGAL BACKGROUND AND STATEMENT OF FACTS

### A.  CUBAN ADJUSTMENT ACT

22. The Cuban Adjustment Act (CAA) is a pivotal piece of legislation in U.S. immigration law, enacted to address the unique circumstances of Cuban nationals seeking refuge in the United States.

23. The Cuban Adjustment Act was enacted on November 2, 1966, during a period of heightened Cold War tensions and significant political upheaval in Cuba. The primary purpose of the Act was to provide a legal pathway for Cuban nationals who fled the communist regime of Fidel Castro to adjust their status to lawful permanent residents (LPR) in the United States. The Act was a response to the humanitarian crisis and aimed to support individuals escaping political persecution.

24. The CAA allows Cuban nationals, and their accompanying spouses and children, who have been physically present in the United States for at least one year to apply for adjustment of status to that of a lawful permanent resident.

25. Unlike other immigration pathways, the CAA waives several standard requirements, such as labor certification and numerical limitations, facilitating a more straightforward adjustment process for eligible individuals.

26. Under § 1 of the Act of November 2, 1966, the Secretary of Homeland Security may, in the Secretary's discretion, adjust the status of certain Cuban refugees to lawful permanent resident.1 To be eligible for such an adjustment, the noncitizen must:

    a.  have been inspected and admitted or paroled into the United States subsequent to January 1, 1959;

    b.  have been physically present in the United States for at least one year;

    c.  make an application for such adjustment;

    d.  be eligible to receive an immigrant visa; and

    e.  be admissible to the United States for permanent residence.

27. Arriving aliens under the CAA face unique jurisdictional challenges. As noted in 8 C.F.R. § 1245.2 (a)(1)(ii), where states:

*"Arriving Aliens. In the case of an arriving alien who is placed in removal proceedings, the immigration judge does not have jurisdiction to adjudicate any application for adjustment of status filed by the arriving alien unless:*

*(A) The alien properly filed the application for adjustment of status with USCIS while the arriving alien was in the United States;*

*(B) The alien departed from and returned to the United States pursuant to the terms of a grant of advance parole to pursue the previously filed application for adjustment of status;*

*(C) The application for adjustment of status was denied by USCIS; and*

*(D) DHS placed the arriving alien in removal proceedings either upon the arriving alien's return to the United States pursuant to the grant of advance parole or after USCIS denied the application."*

28. Arriving aliens assimilate to the position of applicants for admission when seeking adjustment of status, meaning they must meet the same admissibility standards as those seeking entry at the border where Immigration and Nationality Act (INA) § 212 applies to arriving aliens seeking adjustment of status under the CAA.

### B.  AMANDA ISABEL FANEGO CARDOSO

29. Amanda Isabel Fanego Cardoso was born in Cuba and a resident of Tampa, Florida, came to the United States to seek safety from persecution by the communist government in Cuba.

30. While Ms. Fanego Cardoso was making her journey to the United States, her maternal grandmother was shot and killed by the Mexican coyotes.

31. On December 23, 2023, Ms. Fanego Cardoso arrived at the El Paso, Texas, Port of Entry where CBP officers took her into custody, interviewed her, and immigration violation and criminal history checks both produced negative results.

32. She was then paroled under Section 212(d)(5) of the INA until December 21, 2025, see Exhibit B, and served with a Notice to Appear ("NTA") before an IJ at 3535 Lawton Rd, Suite 200, Orlando, Florida 32803 on January 22, 2026, then traveled to Tampa, Florida where she has family and friends.

33. On March 07, 2025, Ms. Fanego Cardoso filed her application for adjustment of status under the CAA, See Exhibit C as is prima facie eligible to apply for adjustment of status under the Cuban Adjustment Act at United States Citizenship and Immigration Services ("USCIS").

34. Ms. Fanego Cardoso has been awaiting the processing of her application by USCIS, complied with all application requirements including the submitting of biometric

information and continued to build a new life in the United States while working and living in Tampa, Florida.

35. June of 2025, Ms. Fanego Cardoso became pregnant, and her expected due date is March 27, 2026, See Exhibit D.

36. However, on August 25, 2025, Ms. Fanego Cardoso was wrongfully arrested and charged with grand theft while she was in a car with four other individuals at a mall in the Orlando area. Store staff (Sunglass Hut) reported "a male in a high-light green shirt" took two Versace pairs.  The male was the driver of the car who admitted post-Miranda that he stole the sunglasses.

37. Ms. Fanego Cardoso was not in the mall but rather in the car, so she was charged with Grand theft (3rd-degree) for constructive possession.

38. Ms. Fanego Cardoso was then transported to the Orlando police station where she was booked and to post bond as an option.

39. Ms. Fanego Cardoso posted bond on September 04, 2025, just before she was to be released, ICE took her into custody and was transferred to Broward Transitional Center in Broward County, Florida.

40. On September 16, 2025, Immigration Judge denied her bond citing to "Respondent is charged as being an "arriving alien" - the Court is without jurisdiction to set a bond in Respondent's case. see Matter of Arguelles", See Exhibit E.

41. Subsequently, she was transferred to Texas then to Chaparral, New Mexico, where she is currently detained.

42. Due to Ms. Fanego Cardoso's detention, she was assigned a public defender then she retained private counsel, Mr. Lazaro Blanco, Esq., which he needs her to appear in criminal court.

43. Mr. Lazaro Blanco, Esq., is planning on filing a motion to dismiss her charges and he believes she has a winnable case, See Exhibit F, Affidavit of Mr. Lazaro Blanco, Esq.

44. On October 2, 2025, Ms. Fanego Cardoso appeared before Immigration Judge where he denied her release citing to lack of jurisdiction despite her adjustment of status application under the CAA.

45. Ms. Fanego Cardoso has been scheduled for another Master hearing on October 30, 2025.

46. Ms. Fanego Cardoso continues to wait for an adjudication of her pending CAA application

**LEGAL FRAMEWORK**

47. The INA prescribes three basic forms of detention for the vast majority of noncitizens in removal proceedings.

48. First, 8 U.S.C. § 1226 authorizes the detention of noncitizens in standard removal proceedings before an IJ. *See* 8 U.S.C. § 1229a. Individuals in § 1226(a) detention are generally entitled to a bond hearing at the outset of their detention, *see* 8 C.F.R. §§ 1003.19(a), 1236.1(d), while noncitizens who have been arrested, charged with, or convicted of certain crimes are subject to mandatory detention, *see* 8 U.S.C. § 1226(c).

49. Second, the INA provides for mandatory detention of noncitizens subject to expedited removal under 8 U.S.C. § 1225(b)(1) and for certain others recent arrivals seeking admission referred to under § 1225(b)(2).

50. Last, the INA also provides for detention of noncitizens who have been ordered removed, including individuals in withholding-only proceedings, *see* 8 U.S.C. § 1231(a)–(b).

51. This case concerns the detention provisions at §§ 1226(a) and 1225(b)(1).

52. The detention provisions at § 1226(a) and § 1225(b)(1) were enacted as part of the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) of 1996, Pub. L. No. 104-–208, Div. C, §§ 302–03, 110 Stat. 3009-546, 3009–582 to 3009–583, 3009–585. Section 1226(a) was most recently amended earlier this year by the Laken Riley Act, Pub. L. No.119-1, 139 Stat. 3 (2025).

53. Following the enactment of the IIRIRA, EOIR drafted new regulations explaining that, in general, people who entered the country without inspection were not considered detained under § 1225 and that they were instead detained under § 1226(a). *See* Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997).

54. Thus, in the decades that followed, most people who entered without inspection and were placed in standard removal proceedings received bond hearings, unless their criminal history rendered them ineligible pursuant to 8 U.S.C. § 1226(c). That practice was consistent with many more decades of prior practice, in which noncitizens who were not deemed "arriving" were entitled to a custody hearing before an IJ or other hearing officer. *See* 8 U.S.C. § 1252(a) (1994); *see also* H.R. Rep. No. 104-469, pt. 1, at 229 (1996) (noting that § 1226(a) simply "restates" the detention authority previously found at § 1252(a)).

55. On July 8, 2025, ICE, "in coordination with" DOJ, announced a new policy that rejected well-established understanding of the statutory framework and reversed decades of practice.

56. The new policy, entitled "Interim Guidance Regarding Detention Authority for Applicants for Admission,"[1] claims that all persons who entered the United States without inspection shall now be subject to mandatory detention provision under § 1225(b)(2)(A). The policy applies regardless of when a person is apprehended and affects those who have resided in the United States for months, years, and even decades.

57. On September 5, 2025, the BIA adopted this same position in a published decision, *Matter of Yajure Hurtado,* 29 I. & N. Dec. 216, 220 (Sept. 5, 2025). There, the Board held that all noncitizens who entered the United States without admission or Arriving Aliens are subject to detention under 8 U.S.C. § 1225(b)(2)(A) and are ineligible for IJ bond hearings.

58. Since Respondents adopted their new policies, dozens of federal courts have rejected their new interpretation of the INA's detention authorities. Courts have likewise rejected *Matter of Yajure Hurtado*, 29 I. & N. Dec. 216, 220 (Sept. 5, 2025), which adopts the same reading of the statute as ICE.

59. Even before ICE or the BIA introduced these nationwide policies, IJs in the Miami, Florida and Chaparral, New Mexico, immigration courts stopped providing bond hearings for persons who entered the United States without inspection and who have since resided here.

---

[1] *Available at* https://www.aila.org/library/ice-memo-interim-guidance-regarding-detention-authority-for-applications-for-admission.

60. Subsequently, multiple Federal District courts found that such a reading of the INA is likely unlawful and that § 1226(a), not § 1225(b), applies to noncitizens who are not apprehended upon arrival to the United States. Court after court has adopted the same reading of the INA's detention authorities and rejected ICE and EOIR's new interpretation. *See, e.g.*, *Gamez Lira v. Noem et al, No. 1:25-CV-00855-WJ-KK, 2025 WL 2581710 (D.N.M. Sept. 5, 2025), Gomes v. Hyde*, No. 1:25-CV-11571-JEK, 2025 WL 1869299 (D. Mass. July 7, 2025); *Diaz Martinez v. Hyde*, No. CV 25-11613-BEM, --- F. Supp. 3d ----, 2025 WL 2084238 (D. Mass. July 24, 2025); *Rosado v. Figueroa*, No. CV 25-02157 PHX DLR (CDB), 2025 WL 2337099 (D. Ariz. Aug. 11, 2025), *report and recommendation adopted*, No. CV-25-02157-PHX-DLR (CDB), 2025 WL 2349133 (D. Ariz. Aug. 13, 2025); *Lopez Benitez v. Francis*, No. 25 CIV. 5937 (DEH), 2025 WL 2371588 (S.D.N.Y. Aug. 13, 2025); *Maldonado v. Olson*, No. 0:25-cv-03142-SRN-SGE, 2025 WL 2374411 (D. Minn. Aug. 15, 2025); *Arrazola-Gonzalez v. Noem*, No. 5:25-cv-01789-ODW (DFMx), 2025 WL 2379285 (C.D. Cal. Aug. 15, 2025); *Romero v. Hyde*, No. 25-11631-BEM, 2025 WL 2403827 (D. Mass. Aug. 19, 2025); *Samb v. Joyce*, No. 25 CIV. 6373 (DEH), 2025 WL 2398831 (S.D.N.Y. Aug. 19, 2025); *Ramirez Clavijo v. Kaiser*, No. 25-CV-06248-BLF, 2025 WL 2419263 (N.D. Cal. Aug. 21, 2025); *Leal-Hernandez v. Noem*, No. 1:25-cv-02428-JRR, 2025 WL 2430025 (D. Md. Aug. 24, 2025); *Kostak v. Trump*, No. 3:25-cv-01093-JE-KDM, 2025 WL 2472136 (W.D. La. Aug. 27, 2025); *Jose J.O.E. v. Bondi*, No. 25-CV-3051 (ECT/DJF), --- F. Supp. 3d ----, 2025 WL 2466670 (D. Minn. Aug. 27, 2025) *Lopez-Campos v. Raycraft*, No. 2:25-cv-12486-BRM-EAS, 2025 WL 2496379 (E.D. Mich. Aug. 29, 2025); *Vasquez Garcia v. Noem*, No. 25-cv-02180-DMS-MM, 2025 WL 2549431 (S.D. Cal. Sept. 3, 2025);

*Zaragoza Mosqueda v. Noem*, No. 5:25-CV-02304 CAS (BFM), 2025 WL 2591530 (C.D. Cal. Sept. 8, 2025); *Pizarro Reyes v. Raycraft*, No. 25-CV-12546, 2025 WL 2609425 (E.D. Mich. Sept. 9, 2025); *Sampiao v. Hyde*, No. 1:25-CV-11981-JEK, 2025 WL 2607924 (D. Mass. Sept. 9, 2025); *see also, e.g.*, *Palma Perez v. Berg*, No. 8:25CV494, 2025 WL 2531566, at *2 (D. Neb. Sept. 3, 2025) (noting that "[t]he Court tends to agree" that § 1226(a) and not § 1225(b)(2) authorizes detention); *Jacinto v. Trump*, No. 4:25-cv-03161-JFB-RCC, 2025 WL 2402271 at *3 (D. Neb. Aug. 19, 2025) (same); *Anicasio v. Kramer*, No. 4:25-cv-03158-JFB-RCC, 2025 WL 2374224 at *2 (D. Neb. Aug. 14, 2025) (same).

61. Section 1226(a) applies by default to all persons "pending a decision on whether the [noncitizen] is to be removed from the United States." These removal hearings are held under § 1229a, to "decid[e] the inadmissibility or deportability of a[] [noncitizen]."

62. By contrast, § 1225(b) applies to people arriving at U.S. ports of entry or who recently entered the United States. The statute's entire framework is premised on inspections at the border of people who are "seeking admission" to the United States. 8 U.S.C. § 1225(b)(2)(A). Indeed, the Supreme Court has explained that this mandatory detention scheme applies "at the Nation's borders and ports of entry, where the Government must determine whether a[] [noncitizen] seeking to enter the country is admissible." *Jennings v. Rodriguez*, 583 U.S. 281, 287 (2018).

63. The Cuban Adjustment Act (Pub. L. 89-732, 80 Stat. 1161 (1966)) creates a unique and congressionally mandated pathway to permanent residence for Cuban parolees who have been physically present for one year.

64. While adjustment under the CAA is discretionary, eligibility for that relief and the right to seek it are statutory entitlements. Courts have recognized that once Congress provides a procedure or benefit, an alien has a due process right to fair adjudication of that relief, *Montilla v. INS*, 926 F.2d 162 (2d Cir. 1991).

65. Thus, once a Cuban has filed or is eligible to file a CAA application, he or she has a liberty interest in the fair consideration of that application, and detention that prevents or obstructs that right infringes due process.

66. If the government's detention prevents the Cuban national from filing, completing, or meaningfully participating in a CAA adjustment application, it denies procedural due process, *Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

67. Accordingly, the mandatory detention provision of § 1225(b) does not apply to people like Petitioner, who have already paroled under 8 U.S.C. § 1182(d)(5), with pending application to adjust status under the CAA, and was residing in the United States at the time they were apprehended.

**CLAIMS FOR RELIEF**

**COUNT I**
**VIOLATION OF THE SUBSTANTIVE DUE PROCESS PROTECTIONS OF THE FIFTH AMENDMENT OF THE CONSTITUTION**

68. Petitioner repeats and incorporates by reference each allegation contained in the preceding paragraphs as if fully set forth herein.

69. The Supreme Court has long recognized that noncitizens physically present in the United States are entitled to due process protections, regardless of their immigration status. *Zadvydas*, 533 U.S. at 693; *Mathews v. Diaz*, 426 U.S. 67, 77 (1976). Freedom from

physical restraint "lies at the heart of the liberty that the Due Process Clause protects." *Zadvydas*, 533 U.S. at 690.

70. By enacting the CAA, Congress created a substantive statutory entitlement to apply for lawful permanent residence—a process conferring a legitimate expectation of fair consideration and, thus, a protected liberty interest under the Fifth Amendment's Due Process Clause. See *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954); *Montilla v. INS*, 926 F.2d 162 (2d Cir. 1991).

71. First, immigration detention must always "bear[] a reasonable relation to the purpose for which the individual was committed." *Demore*, 538 U.S. at 527. (citing *Zadvydas*, 533 U.S. at 690). The Supreme Court has stated that the purpose or civil detention in this context is to "ensur[e] the appearance of aliens at future proceedings," *Zadvydas*, 533 U.S. at 690, and to prevent flight, thereby "increasing the chances that, if ordered removed, the [noncitizens] will be successfully removed." *Demore*, 538 U.S. at 528. In the context of immigration detention, where, as here, the government has recognized the Petitioner eligibility to adjust status and become a permanent resident under the CAA. In *Matter of Garcia*, 16 I&N Dec. 653 (BIA 1978), the BIA held that "*Service policy permits a prima facie qualified beneficiary of a visa petition to remain in the United States pending final adjudication of the petition and an adjustment application*", where detaining someone who has lawful presence through a pending adjustment in CAA cases, a statutorily favored pathway, is arbitrary, particularly without a showing of flight risk or danger to the community, detention is not reasonably related to its purpose.

72. Petitioner has a pending application for adjustment of status under the CAA, which, under 8 C.F.R. § 245.2(a)(4)(ii) places her in a period of stay authorized by the Attorney

General during the pendency of adjudication and suspends the accrual of unlawful
presence.

73. Second, when a noncitizen is not removable, insofar as their properly filed adjustment
application where the government accepted the filing where the petitioner develops
reliance interest, the Due Process Clause requires that any deprivation of liberty be
narrowly tailored to serve a compelling government interest. See *Reno v. Flores*, 507
U.S. 292, 301 (1993) (holding that due process "forbids the government to infringe
certain 'fundamental' liberty interests at all, no matter what process is provided, unless
the infringement is narrowly tailored to serve a compelling state interest"); Demore, 538
U.S. at 528 (applying a less rigorous standard for "deportable [noncitizens]").
Respondents' actions deprive Petitioner of a meaningful opportunity to pursue the
statutory relief Congress has made available to her and thereby violate her procedural due
process rights. See *Mathews v. Eldridge*, 424 U.S. 319 (1976).

74. Here, Ms. Fanego Cardoso is a beneficiary of the CAA, four months pregnant, has
significant and concrete ties to the United States, and she does need prenatal medical
care. Accordingly, she is neither a flight risk nor poses any public safety concern so the
high standard applicable to her case cannot be met.

75. Third, basic due process doctrine provides that an individual must be afforded notice,
appropriate hearings, bond review, opportunity to contest her detention, etc. *Mathews*,
424 U.S. at 333. Ms. Fanego Cardoso was deprived of each of these basic rights until this
petition.

76. Ms. Fanego Cardos's continued detention, without individualized findings of necessity
and in disregard of Petitioner's pending CAA adjustment, is arbitrary and capricious and

violates substantive due process by infringing Petitioner's liberty interest without legitimate governmental purpose.

### COUNT II
### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
### (5 U.S.C. § 706)

77. Petitioner repeats and incorporates by reference each allegation contained in the preceding paragraphs as if fully set forth herein.

78. The Administrative Procedure Act (APA), 5 U.S.C. § 706(2), requires that a reviewing court "hold unlawful and set aside agency action, findings, and conclusions found to be— (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (C) in excess of statutory jurisdiction, authority, or limitations; or (D) without observance of procedure required by law."

79. Respondents, acting through the Department of Homeland Security, Immigration and Customs Enforcement, and U.S. Citizenship and Immigration Services, are agencies within the meaning of 5 U.S.C. § 551(1) and are therefore subject to the APA.

80. The Cuban Adjustment Act ("CAA"), Pub. L. 89-732, 80 Stat. 1161 (1966), provides that any native or citizen of Cuba who has been admitted or paroled into the United States and has been physically present for at least one year "may be adjusted … to that of an alien lawfully admitted for permanent residence" in the discretion of the Attorney General (now the Secretary of Homeland Security).

81. Congress intended the CAA to be broadly humanitarian and to ensure that eligible Cubans may remain in the United States to pursue adjustment.  See *Matter of Garcia*, 16 I&N Dec. 653 (BIA 1978).

82. Petitioner has been paroled into the United States government until December 21, 2025, has satisfied the one-year physical-presence requirement, and has filed a bona fide CAA adjustment application with USCIS.

83. Ms. Fanego Cardos continued detention despite her valid adjustment of status application under CAA and despite no changed circumstances suggesting she presents any risk of flight or public safety concern is arbitrary, capricious, and an abuse of discretion, *See*, 8 U.S.C. § 1182(a)(9)(B)(i).

84. The arbitrary and capricious detention of Ms. Fanego Cardos, despite her valid approvable application for adjustment of status under the CAA and her pregnancy conditions, causes her irreparable harm with each day she remains detained. For the reasons articulated above, this Court should find that any decision to detain Ms. Fanego Cardos is arbitrary, capricious, and unsupported by substantial evidence. *See* 5 U.S.C. §§ 706(2)(A), (E) (The reviewing court "shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "unsupported by substantial evidence.").

85. The Supreme Court has recognized this protection applies regardless of a person's immigration status. See id.; see also *Mathews v. Diaz*, 426 U.S. 67, 77 (1976).

86. In the context of immigration, a period of detention must "bear[] a reasonable relation to the purpose for which the individual was committed." *Demore v. Kim*, 538 U.S. 510, 516–17 (2003).

87. Detaining Petitioner in circumstances where she cannot meaningfully prepare, submit, or pursue her adjustment application effectively nullifies the statutory right created by the

Cuban Adjustment Act and frustrates the congressional purpose underlying that Act and treats similarly situated Cuban parolees inconsistently with established DHS policy.

88. Respondents' conduct is also "not in accordance with law" because it conflicts with the INA, the CAA, and binding agency regulations that preserve eligibility and lawful presence during the pendency of adjustment applications.

## COUNT III

**VIOLATION OF THE *ACCARDI* DOCTRINE WITH RESPECT TO 8 C.F.R. § 236.23(d)**

89. Petitioner repeats and incorporates by reference each allegation contained in the preceding paragraphs as if fully set forth herein.

90. Under the Accardi doctrine, an administrative agency must strictly comply with its own regulations, particularly those designed to protect individual rights.  *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954); *Montilla v. INS*, 926 F.2d 162, 166–68 (2d Cir. 1991).  Agency action taken in disregard of its own binding regulations is unlawful and must be set aside.

91. The United States has violated its own BIA direction and USCIS guidance in this case, as to Ms. Fanego Cardos. Under the *Accardi* doctrine, the government and its agencies are required to follow their own binding rules.

92. DHS's own regulations recognize that Cuban Adjustment Act recipients are granted temporary forbearance from removal and are "lawfully present" for all relevant purposes.

93. Regulations under 8 C.F.R. § 1003.19(h)(2)(i)) bar IJs from reviewing custody for "arriving aliens." However, Petitioner was already paroled into the U.S. - which is exactly what the CAA contemplates. ICE's designation of her as an "arriving alien" for detention purposes contradicts the regulatory framework of the CAA (which presumes

parolees may adjust) and deprives her of the right to have her application adjudicated in a meaningful way.

94. Respondents have failed to comply with these requirements. Despite Petitioner's multiple requests for parole or release under the Cuban Adjustment Act framework, no written decision stating the reasons for denial has been issued, and no notification was provided to the immigration judge having jurisdiction over Petitioner's detention.

95. Respondents' noncompliance with § 236.23(d) directly frustrates Petitioner's ability to pursue her statutory relief under the Cuban Adjustment Act, Pub. L. 89-732, 80 Stat. 1161 (1966), by foreclosing meaningful access to judicial review of her detention and undermining the fairness of the process Congress intended.

96. Here, DHS has disregarded multiple binding regulations, including (1) 8 C.F.R. § 245.2(a)(4)(ii), which preserves the pendency of an adjustment application; and (2) 8 C.F.R. § 236.1(d), 8 C.F.R. § 241.4, which provide for custody review. By ignoring these mandates, Respondents have acted arbitrarily and unlawfully, depriving Petitioner of the protections Congress and DHS itself established. The detention is therefore invalid under the Accardi principle and must be vacated.

## COUNT IV

**VIOLATION OF PROCEDURAL DUE PROCESS PROTECTIONS OF THE FIFTH AMENDMENT OF THE CONSTITUTION**

97. Petitioner repeats and incorporates by reference each allegation contained in the preceding paragraphs as if fully set forth herein.

98. Procedural due process requires notice and an opportunity to be heard before being deprived of a liberty or property interest. *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). One of the first inquiries in any case of violation of procedural due process is whether the

plaintiff has a protected property or liberty interest and, if so, the extent or scope of that interest. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569–70 (1972).

99. The Supreme Court has recognized that property interests arise where "rules or understandings" create "a legitimate claim of entitlement." *Bd. of Regents*, 408 U.S. at 577. Similarly, reliance on government policies and assurances may give rise to protected expectations under the Due Process Clause. *Perry v. Sindermann*, 408 U.S. 593, 601–03 (1972).

100.     Here, Ms. Fanego Cardos's reasonably relied on government assurances—made explicit through innumerable public statements—that the pendency of her adjustment of status application under the CAA provides some protection from arrest, detention, and removal for those who follow the rules, and that the CAA Congress passed allows its recipients to adjust status after being admitted or paroled. This reliance has created a legally protectable liberty interest.

101.     Under the familiar *Mathews v. Eldridge* due process test, then, the government's decision to apprehend Ms. Fanego Cardos's and continue to detain her clearly violates her procedural due process rights. First, Ms. Fanego Cardos's has substantial legally protectable interests, created by her reliance on the government's CAA laws and associated assurances, at stake. Second, the risk of erroneously depriving Ms. Fanego Cardos's of such interests is severe, as she is separated from her medical doctor, family, and work, and thrown into sudden instability. She has been afforded absolutely no process, let alone constitutionally sufficient process, prior to this deprivation. *See Mathews*, 424 U.S. at 343. Third, the government's interest in detaining Ms. Fanego Cardos is minimal. Ms. Fanego Cardos's has been continuously present in the United

States since she was paroled on December 23, 2023, has obvious and concrete ties to the United States. Her detention is thus not rationally related to any purpose civil immigration detention may serve. *See Wong Wing v. United States*, 163 U.S. 228, 235–36 (1896); *Demore*, 538 U.S. at 523, 527–28.

102.    By acting arbitrarily and without procedural safeguards, Respondents have effectively foreclosed Petitioner's ability to pursue statutory relief and to defend against detention, thereby depriving her of liberty without due process of law.

**COUNT V**
**VIOLATION OF THE FOURTH AMENDMENT OF THE CONSTITUTION AND 8 U.S.C. § 1357(a)(2)**

103.    Petitioner repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

104.    The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. The Supreme Court has consistently recognized that immigration arrests and detentions are "seizures" within the meaning of the Fourth Amendment. *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1044 (1984) (acknowledging that deportation proceedings are civil, but the Fourth Amendment still applies to the "seizure" of the person).

105.    As a general matter, the Fourth Amendment requires that all arrests entail a neutral, judicial determination of probable cause. *See Gerstein v. Pugh*, 420 U.S. 103, 114 (1975). That neutral, judicial determination can occur either before the arrest, in the form of a warrant, or promptly afterward, in the form of a prompt judicial probable cause determination. *See id*. Arrest and detention of a person, including of a noncitizen, absent

a neutral judicial determination of probable cause violates the Fourth Amendment of the Constitution. *Id.*; *see also Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 57 (1991). This determination must occur within 48 hours of detention, which includes weekends, unless there is a bona fide emergency or other extraordinary circumstances. *See Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 57 (1991).

106.    Congress enacted a strong preference that immigration arrests be based on warrants. *See Arizona v. United States*, 567 U.S. 387, 407–08 (2012). The Immigration and Nationality Act thus provides immigration officers with only limited authority to conduct warrantless arrests. 8 U.S.C. § 1357(a)(2). Specifically, an officer must have "reason to believe" the person is violating the immigration laws and that the person "is likely to escape before a warrant can be obtained." *Id*. Federal regulations track the strict limitations on warrantless arrests. *See* 8 C.F.R. § 287.8(c)(2)(ii).

107.    Here, at the moment of seizure, Ms. Fanego Cardos's has a pending application for an adjustment of status under the CAA, making her lawfully present. She had lived in Florida for nearly two years, and she is four months pregnant. There is no evidence, and no reason to believe, that she posed a flight risk at the time of her apprehension.

108.    Therefore, no officer could hold a reasonable belief that Ms. Fanego Cardos was likely to escape before or not to appear before an IJ.

109.    Without a statutory basis to arrest, the Government is required under the Fourth Amendment to secure a prompt judicial probable cause determination to continue holding Ms. Fanego Cardos. *Gerstein*, 420 U.S. at 114; *McLaughlin*, 500 U.S. at 56–57. Ms.

Fanego Cardos received no such judicial determination, yet her detention has continued well beyond 48 hours, rendering her detention presumptively unconstitutional.

110.     The Government cannot salvage this seizure by invoking generalized immigration enforcement interests. The Fourth Amendment's reasonableness inquiry is fact-specific and demands individualized justification for both the arrest and the extended detention. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 882–84 (1975); *Gerstein*, 420 U.S. at 114. Here, Ms. Fanego Cardos's is lawfully present under her adjustment of status application under CAA. She should be granted forbearance from removal. She committed no crime justifying her apprehension and despite the current pending charges, there is a presumption of innocence, and she is entitled to have her day in court. She fled no authority. She posed no danger to any person or to the community at large.

111.     Ms. Fanego Cardos's warrantless arrest occurred in violation of the clear, narrow circumstances permitted by statute. Therefore, her arrest and ensuing detention constitutes an unreasonable and unlawful seizure in violation of the Fourth Amendment.

## COUNT VI
### VIOLATION OF THE *ACCARDI* DOCTRINE WITH RESPECT TO 8 C.F.R. § 287.8(c)(2)(i) and (ii)

112.     Petitioner repeats and incorporates by reference each allegation contained in the preceding paragraphs as if fully set forth herein.

113.     The United States has also failed to follow immigration-specific arrest and processing regulations. Regulations governing immigration enforcement require that warrantless arrests conform to the standards in 8 C.F.R. § 287.8(c). Specifically, for any arrest, immigration officers must have reason to believe that an individual committed an offense against the United States or was present illegally. 8 C.F.R. § 287.8(c)(2)(i). And,

for a warrantless arrest, officers must also have reason to believe that an individual is "likely to escape before a warrant can be obtained."  8 C.F.R. § 287.8(c)(2)(ii).

114.    At the time of the arrest and at all times since, Ms. Fanego Cardos has had a valid application under CAA; she fled no authority; and she posed no danger to any person or to the community at large. Therefore, Ms. Fanego Cardos's arrest and continued detention contravene regulations governing immigration arrests in violation of the Fourth Amendment and 8 U.S.C. § 1357(a)(2) by arresting and detaining Petitioner without probable cause or lawful warrant.

## PRAYER FOR RELIEF

WHEREFORE, Petitioner respectfully requests that the Court grant the following relief:

A.    Assume jurisdiction over this matter;

B.    Pursuant to 28 U.S.C. § 2243, issue an order to show cause directing Respondents to file a return within three (3) days absent good cause for a short extension not exceeding twenty days, and set the matter for a prompt hearing;

C.    Prohibit Petitioner's removal from the United States and transfer outside the District of New Mexico during the pendency of this action;

D.    Declare that Petitioner's arrest and continued detention are unlawful;

E.    Grant the writ of habeas corpus and order Petitioner's immediate release from ICE custody;

F.    In the alternative, conduct an immediate, constitutionally adequate individualized custody determination at which the government bears the burden to justify continued

detention, and the Court considers release on bond or other reasonable conditions of supervision;

G.     Award Petitioner her costs and reasonable attorneys' fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and any other applicable authority; and

H.     Grant such other and further relief as law and justice require.

DATED:     October 6, 2025

BADAWI LAW

_____

**SAM Y. BADAWI, ESQUIRE**
Florida Bar Number: 120218
Primary: Sam@badawilaw.com
Secondary: Admin@badawilaw.com
14505 University Point Place
Tampa, Florida 33613
Phone: (813) 508-8808
Fax: (813) 644-7152
Attorney for Petitioner

**Verification by Someone Acting on Petitioner's Behalf Pursuant to 28 U.S.C. § 2242**

I am submitting this verification on behalf of Petitioner because I am one of Petitioner's attorneys. I have discussed with Petitioner the events described in this Petition. On the basis of those discussions, I hereby verify that the statements made in this Petition for Writ of Habeas Corpus are true and correct to the best of my knowledge.

Dated: October 6, 2025                    */s/ Sam Y. Badawi*
                                          Sam Badawi

**CERTIFICATE OF SERVICE**

        I hereby certify that on October 6, 2025, I filed the foregoing pleading electronically through the CM/ECF system which caused all parties or counsel to be served by electronic means as more fully reflected on the Notice of Electronic Filing.

                                          */s/ Sam Y. Badawi*
                                          Sam Badawi